**Patrick BOYLE, James Daugherty, P. Dan Gilbert, Larry Jordan, Charles Maloney, Thomas Martin, Robert Schwartzbauer, and Gary Thaden, as the Board of Trustees of the Twin City Pipe Trades Welfare Trust, et al., Appellants,**

v.

**Morris ANDERSON, in his capacity as the Commissioner of the Minnesota Department of Revenue, et al., Minnesota, Appellees.**

No. 94–2237.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1994.

Decided Oct. 18, 1995.

1096

William Allen Cumming, argued, Minneapolis, MN (Lee A. Henderson and Steven T. Hetland on the brief), for appellant.

Richard S. Slowesi, Assistant Solicitor General, argued, St. Paul, MN (Michael Vanselow on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FAGG, Circuit Judge, and WILSON,[1] District Judge.

WILSON, District Judge.

Plaintiffs-appellants challenged certain provisions of the Minnesota health care reform legislation known as MinnesotaCare. This lawsuit was filed by the trustees of thirteen self-insured welfare benefit plans that provide health care benefits to their 75,000 members, who reside in Minnesota as well as in other states. The welfare benefit plans were created and operate under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001, et seq. The plans are funded through contributions by the covered workers and their employers. Appellants contended that ERISA and the Labor Management Relations Act (LMRA) preempted the "passthrough" to their plans of any part of a 2 percent gross receipts tax imposed by the MinnesotaCare statute on hospitals and other health care providers. Appellants also challenged the data reporting provisions and spending cap provisions of the statute. Defendants-appellees are the commissioners of the Minnesota Departments of Revenue, Health, and Human Services, and the director of the program providing health care coverage to low-income uninsured people in the state. The District Court, the Honorable Paul A. Magnuson presiding, granted summary judgment for defendants, ruling that

plaintiffs did not have standing to challenge the data reporting provisions and spending cap provisions of the statute. Judge Magnuson further ruled that the provider tax portions of the statute are not preempted by ERISA or the LMRA. We affirm.

## SUMMARY JUDGMENT

We review a grant of summary judgment de novo. Summary judgment is appropriate where there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Crain v. Board of Police Commissioners,* 920 F.2d 1402, 1405–1406 (8th Cir.1990). The Supreme Court has stated that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## BACKGROUND

In April, 1992, the Minnesota Health Right Act, now known as MinnesotaCare, became law. The legislators' purpose in passing the law was to reduce health care costs and make health care available for all people in Minnesota. MinnesotaCare created several programs, including one to provide health coverage for low-income uninsured people. The Act also created a Health Care Commission to set limits on health care inflation and take other actions intended to reduce health care costs. To implement the legislation, the Department of Health has promulgated rules regarding collection of data from providers and purchasers of health care to help establish limits on the growth of health care spending. The MinnesotaCare programs are funded by several sources, including a 2 percent tax on gross patient revenues of hospitals, a 2 percent tax on gross revenues of

1. The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

non-hospital health care providers, a cigarette tax increase, and other taxes. In 1994 the Legislature directed the Health Care Commission to re-evaluate the financing structure of the health care reform program, providing that "To the extent possible, universal coverage should be achieved without a net increase in total health spending, taxes, or government spending by recapturing savings and reallocating resources within the system . . . To the extent that universal coverage will require additional funding, revenues may be raised by reducing other general fund spending or through a variety of funding options, including broad-based taxes such as income or payroll." Chapter 625, Art. 6, Section 7, 1994 Minn.Laws 1572.

Hospitals and health care providers are able to pass the cost of the MinnesotaCare 2 percent provider tax to others. The law permits a provider to transfer the expense of the provider tax to third party purchasers such as insurance companies, health maintenance organizations (HMOs), or self-insured employee health plans. The passthrough provision states:

A hospital, surgical center, pharmacy, or health care provider that is subject to a tax under Section 295.52 may transfer additional expense generated by section 295.52 obligations on to all third-party contracts for the purchase of health care services on behalf of a patient or consumer. The expense must not exceed two percent of the gross revenues received under the third-party contract, including copayments and deductibles paid by the individual patient or consumer. . . . All third-party purchasers of health care services. . . . must pay the transferred expense in addition to any payments due under existing or future contracts with the hospital, surgical center, pharmacy, or health care provider, to the extent allowed under federal law. Nothing in this subdivision limits the ability of a hospital, surgical center, pharmacy or health care provider to recover all or part of the section 295.52 obligation by other methods, including increasing fees or charges. Minn.Stat.Section 295.582 (Supp. 1993).

This provision makes it clear that it is not intended to limit the ability of a provider to recover all or part of its tax obligations by other methods, so that providers retain whatever legal right they may otherwise have to recover the cost of the 2 percent tax from purchasers of their services by increasing their charges. If providers use the method of increasing their charges for health care services, third-party purchasers do not receive a separate itemized charge for the provider tax, but they have to pay greater amounts for the services than they would have before the passage of MinnesotaCare.

## ERISA

■ In cases involving preemption analysis, the Supreme Court has ruled that "the purpose of Congress is the ultimate touchstone." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985), citing *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978). In passing ERISA, Congress intended to free employee benefit plans from the threat of conflicting or inconsistent regulations by different states. *Fort Halifax Packing Company v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987). As the Supreme Court concluded in a recent case involving the ERISA preemption provision: "The basic thrust of the preemption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *New York State Conference of Blue Cross & Blue Shield Plans, et al., v. Travelers Insurance Company, et al.,* —— U.S. ——, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The statute provides that it shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. 1144(a). The Supreme Court has held that the words "relate to" should be "construed expansively: 'a law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such plan.'" *Shaw v. Delta Air Lines,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983).

Despite this expansive interpretation of the statute, the Supreme Court has stressed that there are limitations to ERISA's preemption clause. *Ingersoll Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990). Notwithstanding the variety of opportunities for federal preeminance, the Supreme Court has "never assumed lightly that Congress has derogated state regulation, but instead we have addressed claims of preemption with the starting presumption that Congress does not intend to supplant state law." *Travelers, supra,* —— U.S. at ——, 115 S.Ct. at 1676 (citing *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). In addressing allegations that federal law bars state action in fields of traditional state regulation, the *Travelers* Court emphasized that "we have worked on the assumption 'that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.,* citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The Court cautioned that "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop nowhere.' H. James, Roderick Hudson xli (New York ed., *World's Classics* 1980)." *Travelers,* at ——, 115 S.Ct. at 1677. The Court stressed that such an expansive interpretation of the preemption clause "would be to read Congress' words of limitation as mere sham, and to read the presumption against preemption out of the law whenever Congress speaks to the matter with generality." *Id.*

█ As the District Court noted, the Supreme Court in *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) held that the clause did not preempt a state garnishment statute, and in *Fort Halifax, supra,* decided that a state severance pay statute was not preempted by ERISA. Similarly, the Court concluded that Congress did not intend ERISA "to preempt areas of traditional state regulation." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 740, 105 S.Ct.

2380, 2389, 85 L.Ed.2d 728 (1985). ERISA's preemption provisions must be guided by "respect for the separate spheres of governmental authority preserved in our federal system." *Alessi v. Raybestos–Manhattan,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). Furthermore, the Supreme Court has ruled that ERISA does not preempt "a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan." *Metropolitan Life, supra.* In *Shaw, supra,* the Court concluded that "some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* at 100 n. 21, 103 S.Ct. at 2901 n. 21.

## ISSUE OF STANDING REGARDING DATA COLLECTION AND REPORTING PROVISIONS OF MINNESOTA-CARE

█ Appellants contend that the data collection and reporting provisions of MinnesotaCare are preempted by ERISA because they allegedly represent direct regulation of the appellants' plans. The reporting requirements are discussed in two sections of the statute. Section 62J.35 states that the Commissioner of the Minnesota Department of Health "may collect from health care providers data on patient revenues and health care spending during a time period specified by the commissioner." Section 62J.38 states that the commissioner "shall require group purchasers to submit detailed data on total health care spending...." In order to implement these provisions, the Commissioner promulgated emergency rules concerning the data collection and reporting requirements. Minn.R. pt. 4652.0110 provides: "The following group purchasers, as defined under part 4652.0100 [Emergency], subpart 14, are subject to the reporting requirements established by part 4652.0120 [Emergency]: all insurance companies ... that reported $10,000 or more in total health premiums to the Department of Commerce in 1991; and all health service plan corporations.... Employee health plans offered by self-insured employers will be encouraged to comply with

these reporting requirements." The rules promulgated by the Commissioner of Health resolved the apparent conflict in the two statutory provisions in favor of the permissive authority stated in Section 62J.35. The Commissioner has not included ERISA plans in the mandatory data collection and reporting rules. Therefore, employer-based self-insured ERISA health plans "will be encouraged to comply with these reporting requirements", but they are not required to do so. The District Court was correct in the conclusion that "as the statute is currently enforced, therefore, the plaintiffs 'are not required to submit health care care revenue and expenditure data, but are merely 'encouraged' to do so." *Boyle v. Anderson,* 849 F.Supp. 1307, 1311 (D.Minn.1994).

Article III of the United States Constitution confines the federal courts to adjudicating actual "cases and controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) Standing is a threshold issue in every case before a federal court, determining the power of the court to entertain the suit. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). A federal court's jurisdiction can be invoked only when plaintiffs have suffered "some threatened or actual injury resulting from the putatively illegal action." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). The Supreme Court defined the constitutional requirements of standing in *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984): "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Plaintiffs have the burden of proof in establishing standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The District Court in the instant case correctly concluded that since the reporting requirements do not apply to plaintiffs, they have failed to meet their burden of showing that they were in any way injured by the reporting requirements of MinnesotaCare. Plaintiffs have not met the essential injury element, and hence they did not have standing to challenge the reporting requirements.

Plaintiffs contend that the State of Minnesota might at some point in the future change its position and require compliance with the data requirements. The Supreme Court has repeatedly emphasized that the injury must be concrete in both a qualitative and temporal sense: "The complainant must allege an injury to himself that is 'distinct and palpable,' *Warth, supra,* 422 U.S. at 501, 95 S.Ct. at 2206, as opposed to merely 'abstract,' *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 156, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990), citing *Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1664–1665, 75 L.Ed.2d 675 (1983). In summarizing the holdings of numerous cases, the Supreme Court stated that these precedents demonstrated "what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Article III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore,* 495 U.S., at 160, 110 S.Ct., at 1725. Plaintiffs' allegation that the Commissioner could reverse her position and require compliance with the data requirements is a conjectural allegation of "possible future injury" and does not meet the requirements for an injury in fact. The District Court here was correct in concluding that plaintiffs were requesting an advisory opinion to deal with the possibility that at some point in the future the State might revise the reporting requirements to make them applicable to the Plaintiffs. *Boyle, supra,* at 1312. The Supreme Court has held that "The oldest and most consistent thread in the federal law of justiciability is that the federal courts will not grant advisory opinions." *Flast v. Cohen,* 392 U.S. 83, 96–97, 88 S.Ct. 1942, 1950–51, 20 L.Ed.2d 947 (1968) (quoting C. WRIGHT, THE FEDERAL COURTS, 34 (1963).

### THE STANDING ISSUE CONCERNING THE SPENDING CAP PROVISIONS

Plaintiffs alleged that the spending cap provisions of MinnesotaCare would cause

them to "monitor claims expenses during a calendar year to attempt to forecast whether claims expenses will exceed the additional amount authorized by the Commissioner of Health." (Appellant's brief, July 7, 1994, at 20). The spending cap provisions apply to "health carriers." Minn.Stat. 62P.04 (Supp. 1993). Yet, plaintiffs are not within the statutory definition of health carriers, and therefore they are not subject to the regulation limiting increases in costs. Minn.Stat. 62A.011 (Supp.1993). Since Plaintiffs are not required to comply with the spending caps, they have not demonstrated an injury in fact and thus have again failed to establish standing. The District Court was correct in granting summary judgment in favor of defendants on the issue of the spending cap provisions.

## THE PROVIDER TAX ISSUES

[13, 14] The District Court found that the provider tax provisions of MinnesotaCare "related to" the employee benefit plans, and thus were within the scope of ERISA's preemption clause. The Eighth Circuit has established a series of factors to be considered in deciding whether a state statute of general application is preempted by ERISA. *Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1344–45 (8th Cir. 1991) [*Arkansas BCBS*]. Before applying these factors, however, the Court must determine whether the statute is "of general application." A law of general applicability is one that does not treat ERISA plans differently from non-ERISA plans. *New England Health Care Employees Union District 1199 v. Mount Sinai Hospital*, 846 F.Supp. 190 (D.Conn., 1994); *Mackey v. Lanier Collection Agency & Service*, 486 U.S. 825, 830, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988). As this Court explained in *Arkansas BCBS*, statutes of general application "can be distinguished from statutes that actually or implicitly refer to ERISA plans." *Arkansas BCBS*, at 1345 n. 3. The *Arkansas BCBS* Court cited the section of *Mackey* in which the Supreme Court held that Ga.Code Ann. 18–4–22.1, "which singles out ERISA employee welfare benefit plans for different treatment under state garnishment procedures, is preempted under Section 514(a)."

*Mackey*, 486 U.S. at 830, 108 S.Ct. 2182, 2186. The *Mackey* Court noted that the Georgia statute at issue "expressly refers to—indeed, solely applies to—ERISA employee benefit plans." *Id.*, at 829, 108 S.Ct. at 2185. In the case at bar, the provider tax and passthrough provisions of MinnesotaCare do not explicitly refer to ERISA plans, nor do they single out ERISA purchasers of health care for different treatment. The tax applies to all hospital and health care providers, and the passthrough applies to all third-party purchasers. The provider tax does not apply to ERISA plans differently than non-ERISA plans, and it is a statute of general application.

Appellants rely upon *Boise–Cascade Corp. v. Peterson*, 939 F.2d 632 (8th Cir.1991), *cert. denied*, 505 U.S. 1213, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992), but it is not on point. In *Boise–Cascade*, the Court held that a Minnesota legal rule mandating the ratio of journeymen to apprentices in pipefitter training programs was preempted by ERISA. *Boise–Cascade*, at 637. The Court concluded that this "minimum jobsite rule was specifically designed to affect employee benefit plans. The very purpose of the minimum jobsite rule was to require plaintiffs and other employers to train their apprentices in accordance with the minimum jobsite rule." *Id.* The rule "directly" affected an ERISA plan, since it regulated certain terms and conditions of the apprenticeship programs by "establishing the manner in which employers can train and employ both journeymen and apprentice pipefitters." *Id.* at 638. As stated earlier, in the case at bar, the provider tax and passthrough provisions are not directly involved with the terms of ERISA plans and do not single out the ERISA plans for special treatment; and these MinnesotaCare provisions affect all hospitals and health care providers and nongovernment third-party purchasers alike.

## NEGATION OF AN ERISA PLAN PROVISION AND RELATION TO OTHER ERISA STATUTORY PROVISIONS

■■■■■ Courts must look upon the "totality of the state statute's impact on the plan,"

and no one factor is determinative of the ERISA preemption issue. *Id.* at 1345. The District Court appropriately considered the factors stated in *Arkansas BCBS, supra.*

The *Arkansas BCBS* factors first focus upon a determination whether the provider tax negates a plan provision or relates to other ERISA statutory provisions. *Id.* Appellants assert that the provider tax contravenes provisions of the plan as well as provisions of ERISA, because the tax raises costs to the plans. Appellants cite 29 U.S.C. 1103(c)(1), which provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." The effect of the provider tax, according to appellants, is to increase costs to the plans because the tax revenue will be used to fund the state's program of health care for low-income uninsured people who are not beneficiaries of the plans, thus allegedly violating the "exclusive benefits" provision of ERISA.

■ Appellees contend that appellants' argument stretches ERISA's exclusive benefit provision beyond the boundaries intended by Congress. The District Court noted that Section 1103(c)(1) and 29 U.S.C. 1104(a) deal with fiduciary duties for plan administrators and employers. The relevant passage states: "A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(a) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; . . . ." 29 U.S.C. 1104(a)(1)(A). Congress included these provisions in order to make the law of trusts applicable to the plans and to eliminate "such abuses as self-dealing, imprudent investing, and misappropriation of plan funds." *Fort Halifax Packing Co. v. Coyne, supra,* 482 U.S. at 15, 107 S.Ct. at 2219. The legislative history made it clear that the legislation imposed strict fiduciary obligations on those having discretion or responsibility for the management or disposition of pension or welfare plan assets. 120 Cong.Rec. 29,932

(1974) (Statement of Senator Williams on the Conference Report on ERISA). In summarizing the ERISA conference report, Senator Williams stated in the Congressional debate that "the objectives of these provisions are to make applicable the law of trusts; to prohibit exculpatory clauses that have often been used in this field; to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breach of trust." *Id.* The District Court correctly concluded that Congress was concerned with the issues cited above, and it was not concerned with whether persons not covered by ERISA plans were somehow benefitted by the operation of the plans. *Boyle,* at 1313.

The Third Circuit addressed a similar issue regarding ERISA's exclusive benefits provision in *United Wire, Metal and Machine Health & Welfare Fund v. Morristown Memorial Hospital,* 995 F.2d 1179 (3d Cir. 1993), *cert. denied,* — U.S. —, —, 114 S.Ct. 382, 383, 126 L.Ed.2d 332 (1993). The *United Wire* Court stated that there are many forms of state regulation under the police power that lead to increases in the costs of doing business and increases in prices "where the beneficiaries of the regulation are not those who are paying the increased prices." *United Wire,* at 1196. The Court cited the example that states have begun regulating the disposal of medical wastes in order to protect people who would otherwise suffer from "socially irresponsible disposal." *Id.* "Such regulations," the Court concluded, "can significantly increase a hospital's cost of doing business and, accordingly, its billings to plan participants. We are confident, however, that ERISA was not intended to foreclose a state regulation of this kind . . . In short, we are unwilling to attribute to Congress and Section 514 an intent to frustrate efforts of a state, under its police power, to regulate health care costs." *Id.*

The exclusive benefits provisions were intended to prohibit the kinds of wrongful diversions of trust assets that members of Congress discussed in the Congressional debate concerning ERISA fiduciary standards. The indirect benefit enjoyed by others when providers pass through to the plans the cost

of the provider tax neither negate a plan provision nor contradict any provision of ERISA requiring "exclusive benefit," and thus these factors weigh against a finding of preemption.

## EFFECT ON PRIMARY ERISA ENTITIES AND IMPACT ON PLAN STRUCTURE

■ If the provider tax alters relationships among the primary ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—and thereby changes the structure of the plan, then this factor weighs in favor of preemption. *Arkansas BCBS,* at 1346. The Court in *Arkansas BCBS* found that the state law at issue in that case altered the plan structure by transferring the power to determine who could receive benefits under a plan from the plan administrator to the beneficiaries. Appellee is correct in distinguishing the statute in *Arkansas BCBS* from the statute in the instant case. In *Arkansas BCBS,* the challenged law made all bills, notes, and other written arrangements for the payment of money assignable, meaning that the insurer for an ERISA health plan had to accept assignments of insurance benefits made by plan beneficiaries despite the fact that the terms of the plan gave the plan the right to determine who should receive payment. The Court concluded that the Arkansas assignment statute impermissibly altered relationships among primary ERISA entities and changed the plan structure by taking the power to decide who would receive benefit payments under the plan from the plan administrator and giving it to the beneficiaries.

The MinnesotaCare provider tax clearly differs from the Arkansas statute at issue in *Arkansas BCBS.* The passthrough of the provider tax would only cause the plans to pay a slightly increased fee for health care services already covered under the plans; it would not add benefits, nor would it shift any power among plan entities. As the District Court observed, none of the plans answering defendants' interrogatories identified any changes in plan documents or other effects on plan structure as a result of the tax.

■ Plaintiffs rely upon their exclusive benefits theory to contend that the provider tax exerts an impact on plan structure. Since plan assets are used to provide benefits to some people who are not plan beneficiaries by the provider tax, plaintiffs argue that these people thereby become additional plan beneficiaries. This alleged designation of additional beneficiaries "relates to" the plan and its structure, plaintiffs assert, and thus the passthrough is preempted. This argument is basically a rehashing of the "exclusive benefit" theory plaintiffs presented about the issues already discussed concerning "negation of a plan provision and relation to other ERISA statutory provisions." The ERISA exclusive benefits provision does not prohibit every indirect benefit to people other than plan beneficiaries. Plaintiffs again are overreaching in their interpretation of the exclusive benefits provision in claiming that anyone who gains indirect benefits is thereby transformed into a beneficiary; as Judge Magnuson correctly stated, such a view would mean that every state law that led to increases in plan costs—such as sales tax, minimum wage or environmental regulation statutes—would be preempted.[2] *Boyle,* at 1314. The provider tax does not result in any alteration in the authority of the primary ERISA entities, nor does it have an impact on the terms of the plan itself; thus, this factor weighs against preemption.

**2.** Plaintiffs cite *Bricklayers Local No. 1 v. Louisiana Health Insurance Association,* 771 F.Supp. 771 (E.D.La.1991) in making their exclusive benefit argument. The Louisiana District Court's opinion in *Bricklayers* has no binding authority upon this Court, which declines to follow the reasoning of that decision. *Bricklayers* espoused an expansive view of the exclusive benefits theory, in the context of a state statute that required hospitals to impose additional charges, whereas in this case the passthrough is voluntary. More-

over, the *Bricklayers* Court failed to consider the legislative intent and legislative history of the exclusive benefits provision, nor did it analyze the implications of its decision for the numerous costs that are already included in hospital charges. As previously stated, the Court finds the Third Circuit's interpretation of the exclusive benefits provision stated in *United Wire,* discussed above, to be clearly superior to the expansive approach in *Bricklayers.*

## IMPACT ON ADMINISTRATION
## OF THE PLANS

A state law can have both an intrastate and interstate impact on the administration of ERISA plans. *Arkansas BCBS*, at 1346. In *Arkansas BCBS*, the Court ruled that the statute had an impact on intrastate plan administration because it gave plan beneficiaries control of assignments of benefits. *Id.* at 1347. This imposed an extra administrative burden on plan officials in determining on an individual basis to whom benefits should be paid. In *Mac-Lean v. Ford Motor Company*, 831 F.2d 723 (7th Cir.1987), the Court held that ERISA preempted a state testamentary law. In *MacLean*, however, the Court had also relied on another factor—negation of a plan term—in finding preemption, and the testamentary law at issue required the plan administrator to distribute the deceased employee's pension assets according to the employee's will rather than using the method provided for in the plan. *MacLean*, at 728. The *Arkansas BCBS* Court conceded that courts have disagreed whether a state law that requires an administrator to distribute plan benefits in a certain way has more than a tenuous impact on administration. *Arkansas BCBS* at 1347. The Court noted that the Supreme Court in *Mackey*, 486 U.S. at 831–40, 108 S.Ct. at 2186–91 (state garnishment law) and the Second Circuit in *Aetna Life Insurance Company v. Borges*, 869 F.2d 142, 147–148 (2d Cir.1989) (state escheat law) found that state statutes affecting benefit distribution did not "relate to" ERISA plans. The Court distinguished between the statutes in *Mackey* and *Aetna* by emphasizing that "Unlike the Arkansas assignment statute, state garnishment and escheat statutes do not shift control over benefit distribution." *Id.*

Judge Magnuson correctly concluded that the passthrough does not impose an administrative burden. The passthrough does not require a claims administrator to analyze each claim based upon potentially divergent, individual assignments of benefits. Plaintiffs did not identify any additional administrative actions taken or costs incurred as a result of the passthrough. As the District Court pointed out, plaintiffs' answers to interrogatories acknowledged that the sole administrative inefficiency "was that in the rare instances of hospitals that submit a separate billing for the provider tax, an extra administrative cost is incurred in processing that additional payment." *Boyle*, at 1315. The usual methods of passing through the provider tax, however, are "including it in increased charges or by adding the passthrough as a separate item on the hospital bill." *Id.* Appellants have not identified any administrative impact caused by these methods, which involve the vast majority of the passthrough of the tax. Thus, appellees are correct that the tax does not have a genuine intrastate administrative impact.

In arguing that the tax affects interstate administration, appellants contend that plan beneficiaries in Minnesota will be subject to the tax, while plan participants living outside of Minnesota will not be subject to the tax. When a state law has an interstate administrative impact on ERISA plans because multi-state plans would be subject to potentially conflicting laws of 50 states, this factor favors preemption. *Arkansas BCBS*, at 1348. The Supreme Court has stressed that a main purpose of ERISA was the protection of plan participants from the threat of inconsistent state regulation. *Fort Halifax*, 482 U.S. at 9–10, 107 S.Ct. at 2216–17. The *Arkansas BCBS* Court found that the Arkansas assignment statute could conflict with assignment statutes in other states, thus causing plan administrators to engage in a meticulous evaluation of each claim and creating "numerous administrative difficulties for multi-state ERISA plans." *Arkansas BCBS*, at 1348. In contrast, plan administrators involved here do not have to be concerned about conflicting state laws. The case law does not indicate that a minor difference in cost of services among the states would lead to a finding of preemption. The Supreme Court emphasized in *FMC Corp. v. Holliday*, 498 U.S. 52, 57–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) that requiring plan providers "to design their programs in an environment of differing state regulations would complicate the administration of nationwide plans, producing inefficiencies that employers might offset with de-

creased benefits." Where a patchwork of regulations would inject "considerable inefficiencies in benefit program operation," the Supreme Court has applied the preemption clause to make certain that plans are governed by only a single set of regulations. *Fort Halifax,* 482 U.S. at 11, 107 S.Ct. at 2217. No such "considerable inefficiencies" and complications are present in the instant case.

The provision produces the impact that the price for health care services may differ from state to state, but this will not cause them to redesign their plans or cause inefficiencies. The District Court stressed that plaintiffs' answers to interrogatories revealed that their plans are presently organized to accommodate different costs for similar services; the plans indicated that the hospital charges they pay for the same services vary, and they acknowledged that the differential among the charges exceeds two percent. *Boyle,* at 1315. Thus, the possibility that an extra two percent will be payable on some bills but not on others cannot involve additional administrative expense and does not cause difficulties for the plans to operate on a multi-state basis.[3]

Intrastate as well as interstate administrative impact of state statutes may be "only tenuous," leading courts to the conclusion that they are not the "type[s] of laws Congress intended to preempt." *Aetna,* 869 F.2d, at 147–148. The provider tax has too tenuous, remote and peripheral an intrastate and interstate administrative impact, and the District Court was correct in its ruling that this factor weighs against a finding of preemption.

### ECONOMIC IMPACT

The *Arkansas BCBS* Court ruled that tenuous and peripheral economic impact, by itself, is not sufficient to find preemption. *Arkansas BCBS,* at 1348. The Court acknowledged, however, that "Like all the fac-

tors considered, ... simply because the existence of some economic impact is not dispositive of the preemption issue does not make this factor irrelevant to the preemption inquiry. In fact, this factor is highly relevant to whether the ... statute relates to ERISA plans." *Id.* Appellants contend that economic impact by itself caused by an indirect tax on an ERISA plan is sufficient to find preemption; in making this argument they place substantial reliance upon *The Travelers Insurance Company v. Cuomo,* 14 F.3d 708 (2d Cir.1993) (later reversed, as discussed below) and *E–Systems, Inc. v. Pogue,* 929 F.2d 1100 (5th Cir.1991). At the time the briefs were filed in this case, Circuit Courts differed in their analyses of the factor regarding economic impact of a state statute upon a plan. In *E–Systems,* the Fifth Circuit stated that the economic impact of a state law could by itself warrant a finding of preemption. *E–Systems,* at 1103. In the Second Circuit's *Travelers* decision, the Court held that a state statute that imposes "a significant economic burden" on ERISA plans "relates to" ERISA and is preempted. *Travelers,* at 721.

The view taken by the Ninth and Third Circuits differed from the Second and Fifth Circuits. More importantly, the Eighth Circuit in *Arkansas BCBS* clearly did not accept the view that economic impact alone could suffice for a finding of preemption, since it stressed that "We do not believe that any one factor, by itself, is determinative of the ERISA preemption issue ..." *Arkansas BCBS,* at 1345. In *Lane v. Goren,* 743 F.2d 1337, 1340 (9th Cir.1984), the Ninth Circuit rejected the view that every state law that increases the costs of an ERISA plan is preempted, explaining: "That argument does not withstand scrutiny. So, too, for example, do State law and municipal ordinances regulating zoning, health, and safety increase the operational costs of ERISA trusts, but no one could seriously argue that they are

---

**3.** The District Court also pointed out that independent sources of information have found substantial price differences within Minnesota and in comparison to other states. *See* Council of Hospital Corporations, *Revised Hospital Charges By Diagnosis Related Group* (November, 1990) (stating that there were variations in charges

among Minnesota hospitals as well as in comparison to other states); Wisconsin Department of Health & Social Services, *Health Care Data Report, Hospital Utilization and Charges in Wisconsin* (1991) (citing charges of Wisconsin hospitals for similar services that differ within Wisconsin and in comparison with Minnesota).

preempted." Similarly, the Third Circuit in *United Wire, supra,* rejected an ERISA preemption challenge and upheld a New Jersey hospital rate-setting law intended to contain health care costs. The Third Circuit explained: "Insofar as the regulation of hospital rates affects a plan's cost of doing business, it also may be analogized to State labor laws that govern working conditions and labor costs, to rent control laws that determine what employee benefit plans pay or receive for rental property, and even to such minor costs as the Thruway, bridge and tunnel tolls that are charged to plans' officers or employees." *United Wire,* at 1194. The Court concluded that "if ERISA is held to invalidate every state action that may increase the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress." *Id.,* citing *Rebaldo v. Cuomo,* 749 F.2d 133 (2d Cir.1984).[4]

After the parties filed their briefs in the case at bar, the recent Supreme Court decision in *Travelers, supra,* devoted substantial attention to the "economic impact" factor, reversing the Second Circuit's ruling in *Travelers* and stating a position that supports the Third Circuit in *United Wire. Travelers,* —— U.S. at ——, 115 S.Ct., at 1676. *Travelers* dealt with a New York statute that regulated rates for all in-patient care, except for services provided to Medicare beneficiaries. Patients are charged not for the cost of their individual treatment, but for the average cost of treating the patient's medical problem, as classified under one of almost 800 Diagnostic Related Groups (DRGs). *Id.* at ——, 115 S.Ct. at at 1674. The DRG classifications are adjusted to take into consideration each hospital's particular operating costs, investments, debts, costs of charity care, and other relevant characteristics. Patients with Blue Cross/Blue Shield coverage, Medicaid patients, and HMO participants are billed at the hospital's DRG rate, but others are not. Patients served by commercial insurers that provide in-patient hospital coverage on an expense-incurred basis, by self-insured funds directly reimbursing hospitals, as well as by "certain workers' compensation,

volunteer firefighters' benefit, ambulance workers benefit, and no-fault motor vehicle insurance funds, must be billed at the DRG rate plus a 13 percent surcharge to be retained by the hospital. N.Y.Pub.Health Law 2807–c(1)(b)." *Id.* In addition, for the year ending March 31, 1993, hospitals had to bill commercially insured patients for a further 11 percent surcharge to be turned over to the state. The New York law further imposed a surcharge on HMOs that varied according to the number of Medicaid recipients the HMO enrolled; this surcharge could run as high as 9 percent of the aggregate monthly charges paid by an HMO for its members' in-patient hospital care. This assessment is a direct payment by the HMO to the state's general fund. Several commercial insurers who were acting as fiduciaries of ERISA plans filed suit to invalidate the 13 percent, 11 percent and 9 percent surcharges. *Id.* at ——, 115 S.Ct. at 1675.

The Supreme Court rejected the Second Circuit's conclusion that the three surcharges 'relate to' ERISA because they impose a "significant economic burden" and therefore exert an impermissible impact on ERISA plan structure and administration. *Id.* at ——, 115 S.Ct. at 1676. Justice Souter's opinion for the unanimous Court stated that since the surcharges are presumably passed on at least in part to those who buy commercial insurance or HMO membership, they "have an indirect economic effect on choices made by insurance buyers, including ERISA plans." *Id.* at —— ——, 115 S.Ct. at 1678–1679. Nevertheless, the Court ruled that an indirect economic influence does not bind plan administrators to any specific choice "and thus function as a regulation of an ERISA plan itself; commercial insurers and HMOs may still offer more attractive packages" than the Blue Cross and Blue Shield plans. *Id.* at ——, 115 S.Ct. at 1679. Such an indirect influence does not preclude uniform administrative policies, nor does it complicate a uniform interstate benefit package; it simply bears on the costs of benefits "and the relative costs of competing insurance to provide them." This influence can affect "a

---

**4.** Another portion of *Rebaldo* was overturned in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), but the above-quoted reasoning is still sound.

plan's shopping decisions," Justice Souter wrote, "but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges." *Id.* The Court found nothing remarkable about surcharges on hospital bills, observing that rate variations among hospital providers are accepted examples of cost variation, "since hospitals have traditionally 'attempted to compensate for their financial shortfalls by adjusting their price ... schedules for patients with commercial health insurance.'" *Id.* (citing Thorpe, *Does All–Payer Rate Setting Work? The Case of the New York Prospective Hospital Reimbursement Methodology,* 12 J. Health Politics, Policy & Law 391, 402 (1987)). Even before state regulation, charge differentials for commercial insurers varied dramatically across regions, within a range from 13 to 36 percent, reflecting the geographically different burdens of providing for the uninsured. *Id.*

The *Travelers* Court concluded that if the common character of rate differentials without any state action makes it unlikely that ERISA was intended to preempt indirect economic influences of state laws, "the existence of other common state action with indirect economic effects on a plan's costs leaves the intent to preempt even less likely." For example, when the state sets quality standards in one subject area of hospital services but not another, such action would have an impact on the relative cost of those services over others, and thus of providing different packages of health insurance benefits. *Id.* "Even basic regulation of employment conditions," Justice Souter added, "will invariably affect the cost and price of services." In the instant case, hospitals pass through to third party payers such costs as those involved in disposal of hazardous chemicals, compliance with state OSHA standards; hospitals also pass on in their charges state unemployment compensation taxes, payroll taxes, and property taxes. (Affidavits of Douglas Fenstermaker, Exhibit J to affidavit of Richard Slowes). In reaching the conclusion that cost uniformity was not an object of preemption, the Court explained:

"Indeed, to read the preemption provision as displacing all state laws affecting costs and charges on the theory that they

indirectly relate to ERISA plans that purchase insurance policies or HMO memberships that would cover such services, would effectively read the limiting language in Section 514(a) out of the statute ... While Congress' extension of preemption to all 'state laws relating to benefit plans' was meant to sweep more broadly than 'state laws dealing with the subject matters covered by ERISA, reporting disclosure, fiduciary responsibility, and the like,' *Shaw, supra,* 463 U.S., at 98 n. 19, 103 S.Ct., at 2900 n. 19, nothing in the language of the Act or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern. [citations omitted] In sum, cost uniformity was almost certainly not an object of preemption, just as laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans." [citation omitted]. *Id.* —— U.S. at ——, 115 S.Ct. at 1680.

Justice Souter observed that the Court's conclusion was confirmed by the decision in *Mackey, supra,* in which the Court held that ERISA preemption falls short of barring application of a general state garnishment law to participants' benefits in the hands of an ERISA welfare benefit plan. The Court made that decision despite the fact that garnishment would impose administrative costs and burdens upon benefit plans. If a law authorizing indirect administrative costs is not preempted, the *Travelers* Court reasoned, then a law operating as an indirect source of economic impact on administrative decisions also should not trigger preemption. *Id.*

The Supreme Court stipulated that it was not holding that ERISA preempts only direct regulation of ERISA plans, because "We acknowledge that a state law might produce such *acute, albeit indirect, economic effects,* by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law *might*

indeed be preempted under Section 514." (emphasis added) *Id.* —— U.S. at ——, 115 S.Ct. at 1683. New York's surcharges did not fall into either category, for they affected only indirectly the "relative prices of insurance policies, a result no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate." *Id.*

In the instant case, Judge Magnuson pointed out that the economic impact in *Travelers* was much greater than the relatively small provider tax of MinnesotaCare. *Boyle,* at 1316. Clearly, if the Supreme Court found the surcharges of thirteen, eleven and nine percent to be insufficient regarding the "economic impact" factor in *Travelers,* then the smaller tax involved in *Boyle* is obviously insufficient to constitute the "acute, albeit indirect, economic effects" that "might" trigger preemption under the *Travelers* analysis.

Appellants cited *E–Systems v. Pogue, supra,* in support of its argument that economic impact alone is sufficient for a finding of preemption. In *E–Systems,* the Fifth Circuit dealt with a state statute that imposed a 2.5 percent tax on organizations receiving an administrative or service fee from self-funded health plans. *E–Systems,* at 1101. The tax also applied to the value of benefits pro-

cessed by the administrator; the administrative provider of services to ERISA plans was charged the tax and the cost was passed through to the plans. The *E–Systems* Court stated that the State of Texas "contends that [the statute's] mere economic impact on a plan is an insufficient reason to invalidate the tax. We do not agree." *Id.* at 1103. The Fifth Circuit ruled that "The cost of the plan must therefore increase for the employer and/or employees or the benefits must be adjusted downwards to offset the tax bite. This is the type of impact Congress intended to avoid when it enacted the ERISA legislation." *Id.* The statute at issue in *E–Systems* had a smaller economic impact than the one involved in *Travelers.*[5] *E–Systems* was an even more expansive interpretation of the preemption clause than the analysis of economic impact found in the Second Circuit's *Travelers* decision, which qualified its holding by finding that only a "significant economic burden" could serve as the basis for preemption. *Travelers,* 14 F.3d, at 721.[6] Appellees contend that the *E–Systems* Court had determined that "any" economic impact would warrant preemption. There is little discussion of this question in the *E–Systems* opinion and it is thus unclear whether the Court intended to go as far as appellees allege; but

---

**5.** Both parties discussed the question of how significant the economic impact of the provider tax will be. Appellants argued in their brief that Minnesota's program is underfunded and will have to be increased. This argument is based only upon newspaper reports. Furthermore, the Legislature commissioned a study of the MinnesotaCare programs and asked for recommendations that specifically included "broad-based taxes such as income or payroll." Chapter 625, Art. 6, Section 7, 1994 Minn.Laws 1572. Appellants' contention on this question is based upon speculation. Appellees contend that the actual economic impact is less than 2 percent, because MinnesotaCare will eventually have some indirect economic benefit in addition to the indirect economic burden of the tax. As uninsured people become covered by MinnesotaCare, the amount of uncompensated care incurred by providers will lessen, in appellees' view. Plaintiffs' answers to interrogatories indicated that the plans now pay hospital charges that include a component by which the hospitals recover uncompensated care. Appellees also assert that to whatever degree the provider tax reduces those amounts, the plans will have the benefit of offsetting reductions in hospital charges, and similar-

ly, to the extent that "the provider tax is used to fund other facets of the cost containment component of the MinnesotaCare program, such as imposing uniform payment forms and procedures that cut administrative costs, the plans will also be benefited." While appellees present a plausible argument that the impact is some as yet undetermined amount less than 2 percent, this is not necessary regarding the economic impact argument, for even if there are no significant economic benefits from it, the 2 percent tax does not have a sufficient economic impact for it to weigh in favor of preemption.

**6.** Judge Magnuson stated that the statute in *E–Systems* differed from the one in *Boyle.* The Texas statute imposed a tax on plans that were "virtually identical to those covered by ERISA ... Thus, the Texas law 'related to' ERISA plans on its face ... In contrast, the MinnesotaCare provider tax does not involve direct taxation on services offered by ERISA plans." *Boyle,* at 1316. Whether or not the Texas and Minnesota statutes are different, it is clear that the *E–Systems* analysis of the economic impact factor is incorrect.

the view that any economic impact would be sufficient is clearly erroneous. *Travelers,* — U.S. at ——, 115 S.Ct. at 1683. The *E-Systems* statement that Congress generally intended to eliminate state statutes with indirect economic effects is not correct in view of the Supreme Court's conclusion in *Travelers* that indirect economic effects that are "acute" might suffice for preemption; as Justice Souter's opinion stressed, Congress certainly did not intend to eliminate the innumerable state laws having indirect effects "in areas traditionally subject to local regulation." *Travelers,* — U.S. at ——, 115 S.Ct. at 1683.

The Supreme Court devoted substantial attention to the legislative history of ERISA and other evidence of Congress' intent in passing ERISA. The Court pointed out that the basic Diagnostic Related Groups system, even without a surcharge, "like any other interference with the hospital services market, would fall on a theory that all laws with indirect economic effects on ERISA plans are preempted under Section 514(a)." *Id.* at ——, 115 S.Ct. at 1681. Such an "unsettling result" would be all the more remarkable because several states—including New York, New Jersey, California, Maryland, and several others—regulated hospital charges at the time Congress passed ERISA. *Id.* Nothing in ERISA's legislative history indicates that Congress intended to eliminate these state laws. *Id.* Moreover, the same Congress that passed ERISA a few months later passed the National Health Planning and Resources Development Act of 1974 (NHPRDA), which sought to encourage and help fund state responses to rising health care costs and the widely diverging availability of health services. *Id.* at ——, 115 S.Ct. at 1682. The Court rejected the expansive interpretation of the preemption clause, stating that such a view would render the entire NHPRDA meaningless by denying states the authority to do what Congress was expressly trying to encourage them to do by enacting the legislation. Considering the reality that the NHPRDA was enacted after ERISA and by the same Congress, Justice Souter wrote, "it just makes good sense to reject such an interpretation." *Id.* The history of Medicare regulation illustrates the same point, the

Court stressed, "confirming that Congress never envisioned ERISA preemption as blocking state health care cost control, but rather meant to encourage and rely on state experimentation like New York's." The *Travelers* Court followed Justice Brandeis' admonition that Courts should be wary of obstructing the states in their varied efforts to grapple with the great public issues of the day: "Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747, *New State Ice Co. v. Leibmann,* (1932) (Brandeis, J., dissenting). Justice Souter cited the U.S. House of Representatives' report on the Social Security Amendments of 1983, in which the Ways and Means Committee emphasized that "State systems provide a laboratory for innovative methods of controlling health care costs, and should, therefore, not be limited to one methodology." *Travelers,* — U.S. at —— n. 6, 115 S.Ct. at 1682 n. 6, citing H.R.Rep. No. 98–25, pt. 1, pp. 146–147 (1983) U.S.Code Cong. & Admin.News 1983 pp. 143, 365, 366. In the context of the MinnesotaCare legislation, *Travelers* and the other precedents cited in this litigation compel this Court not to preempt a state's effort to serve as a "laboratory of democracy" in the realm of health care.

The District Court was correct in ruling that the economic impact of the provider tax is tenuous, remote and peripheral, and therefore this factor weighs against a finding of preemption.

## EXERCISE OF TRADITIONAL STATE POWER

The passage of MinnesotaCare was an exercise of the state's inherent police powers in the area of health care, in which states have traditionally enacted statutes, as Judge Magnuson noted. *Boyle,* at 1317. As Justice Blackmun wrote for the Court in *Metropolitan,* "The States traditionally have had great latitude under their police powers

to legislate as to 'the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan,* 471 U.S. at 756, 105 S.Ct. at 2397 (citing *Slaughter–House Cases,* 16 Wall 36, 62, 21 L.Ed. 394 (1873). Judge Magnuson did not find that this factor weighed either for or against preemption, for he cited the statement in *Arkansas BCBS* in which this Court stated that it was not convinced that the traditional nature of a state's exercise of authority properly bears on the question of whether a state statute "relates to" ERISA plans. *Arkansas BCBS,* at 1350. In making this statement, the Court observed that "Although the Supreme Court has not discussed the relevance of this factor, its failure to consider this criterion when deciding ERISA preemption cases is telling." (citing *Mackey, supra,* and *FMC Corp. v. Holliday, supra.*) *Id.* In *Travelers,* however, the Supreme Court did mention this factor, stating that "nothing in the language of the Act or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern. *See Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985); 1 B. Furrow, T. Greaney, S. Johnson, T. Jost, & R. Schwartz, *Health Law,* Sections 1–6, 1–23 (1995)." *Travelers,* at ——, 115 S.Ct. at 1680. In another passage Justice Souter wrote that the surcharges in the New York statute indirectly affected relative prices of insurance policies, a result "no different from myriad state laws in areas traditionally subject to local regulation," which Congress did not intend to eliminate. *Id.* at ——, 115 S.Ct. at 1683. After *Travelers,* apparently the exercise of traditional state power is clearly a factor that is relevant to the preemption analysis. Moreover, in *Metropolitan, supra,* the Supreme Court had stated that "We also must presume that Congress did not intend to preempt areas of traditional state regulation." *Metropolitan,* 471 U.S. at 740, 105 S.Ct. at 2389. It is not necessary, however, to rely upon this factor in order to reject the

preemption challenge in the instant case, since all the other factors clearly weigh against preemption.[7]

The factors of economic impact, effect on primary ERISA entities and impact on plan structure, whether the statute negates a plan provision or relates to other ERISA statutory provisions, and impact on administration of ERISA plans, clearly lead to the conclusion that MinnesotaCare has only a tenuous, remote and peripheral affect on the plans. ERISA does not preempt the provider tax.

## LABOR MANAGEMENT RELATIONS ACT

█ Appellants contend that the provider tax conflicts with the Labor Management Relations Act (the LMRA or the Taft–Hartley Act of 1947), 29 U.S.C. 141 *et seq.,* and is thus preempted by the Supremacy Clause of the United States Constitution. The section of the LMRA at issue is a criminal statute generally prohibiting employers from giving money or other valuable items to representatives of their employees. 29 U.S.C. 186. The statute contains an exception providing that contributions paid for health care benefits on behalf of employees under collective bargaining agreements must be held in trust for the exclusive benefit of the employees, their families, and dependents. 29 U.S.C. 186(c)(5). Appellants assert that the MinnesotaCare provider tax violates the exclusive benefits provision of LMRA by requiring them to pay higher costs in order to benefit people who are not plan participants.

Appellants' reliance upon Section 186 is misplaced. In *Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), the Supreme Court explained the purpose of this section of LMRA: "Those members of Congress who supported [Section 186] were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds

---

7. The *Arkansas BCBS* Court acknowledged that the exercise of traditional state power "arguably is a policy consideration useful in deciding borderline questions of ERISA preemption." *Arkan-* *sas BCBS,* at 1350. Since this case does not present a borderline ERISA preemption question, it is not necessary to discuss policy considerations in this context.

were left to their sole control." The legislative history reveals Congressional intent in passing the legislation. As Senator Taft, the primary author of the LMRA, stated: "Certainly unless we impose some restrictions we shall find that the welfare fund will become merely a war chest for the particular union, and that the employees for whose benefit it is supposed to be established, for certain definite welfare purposes, will have no legal rights and will not receive the kind of benefits to which they are entitled after such deductions from their wages." 93 Cong.Rec. 4877 (1947), 2 Leg.Hist. LMRA, at 1312. Congress believed that if welfare funds were established that did not provide specific definitions of the benefits that were payable under them, "a substantial danger existed that such funds might be employed to perpetuate control of union officers, for political purposes, or even for personal gain." *Arroyo,* at 425–426, 79 S.Ct. at 868. This Court cited the above quotation from *Arroyo* in making clear that the Congressional objective in passing the LMRA was in "keeping large sums of employee-earned money out of the sole control of union officers" in order to prevent corruption or possible abuses of power by union officers for political purposes or personal gain. *Master Insulators of St. Louis v. Local No. 1,* 925 F.2d 1118, 1121 (8th Cir.1991). The District Court aptly cited a more recent Supreme Court decision following *Arroyo* in *United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). In *United Mine Workers,* Justice Stevens stressed that Section 186 was intended to "protect employees from the risk that funds contributed by their employers for the benefit of the employees and their families might be diverted to other union purposes or even to the private benefit of faithless union leaders." *United Mine Workers,* 455 U.S., at 571–572, 102 S.Ct., at 1231. Supporters of the LMRA exclusive benefits provision were concerned that pension funds that were administered solely by union leaders might serve as war chests for union programs or political factions, or they might become instruments through which "'racketeers' accepted bribes or extorted money from employers." *Id.*

The District Court rejected the argument that Section 186 denied states power to enact laws such as the provider tax, with its "only tangential impact on employee benefit plans." *Boyle,* at 1317. Appellants have not cited any cases in which Section 186 preempted a state law that imposed a tax or increased costs that were passed on to an employee trust fund. This section was clearly intended to prevent the use of employee contributions for personal or political war chests, or instruments for bribery or extortion. The MinnesotaCare law in no way obstructs the objectives of Section 186. To the extent that appellants' argument regarding the LMRA exclusive benefits provision is similar to its argument based on the ERISA exclusive benefits provision, the Court rejects that view for the reasons discussed in previous sections of this opinion. Just as the provider tax does not violate ERISA's requirement that plan funds be held for the exclusive purposes of providing benefits to plan participants, it does not violate the LMRA's requirement that the funds be maintained for the exclusive benefit of the employees. The District Court was correct in its conclusion that Section 186 is not in conflict with the LMRA.

Appellees assert that appellants have impermissibly raised a new issue on appeal concerning National Labor Relations Act (NLRA) preemption, citing the rule stated in *Hinton v. CPC International, Inc.,* 520 F.2d 1312, 1314 (8th Cir.1975) ("It is well settled law that issues not raised in the trial court cannot be considered by an appellate court as a basis for reversal."). Appellants reply that the LMRA is an amendment to the National Labor Relations Act, with the two acts comprising fundamental components of "what we know as our National Labor Law." (Appellants' reply brief, at 19). Moreover, it is uncertain that plaintiffs had standing to present this claim, because they are not the unions that could hypothetically be injured under the NLRA claim; plaintiffs are the trustees of the ERISA plans funded by union members and their employers. Even assuming, *arguendo,* that appellants have standing and that they are not raising a new issue on appeal, the NLRA argument

still does not present a valid argument for preemption.

In their NLRA argument, appellees rely primarily upon *Golden State Transit Corporation v. City of Los Angeles*, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), in which the Supreme Court held that the NLRA preempted the City of Los Angeles' action in conditioning the renewal of a taxicab franchise renewal on the cab company's settlement of a labor dispute. The *Golden State* Court ruled that Los Angeles had intruded into the collective bargaining process to the extent of becoming a party to the negotiations. *Id.* at 619, 106 S.Ct. at 1401. Appellants contend that the unions will negotiate different terms in their next collective bargaining agreements in response to the provider tax. Appellees are correct that the MinnesotaCare provider tax does not inject the State into collective bargaining or otherwise involve the degree of state intrusion involved in *Golden State*, in which the Court stressed that the Los Angeles City Council's settlement condition "*destroyed* the balance of power designed by Congress, and frustrated Congress' decision to leave open the use of economic weapons." *Id.* (emphasis added).

Appellants also cite *Hydrostorage v. Northern California Boilermakers Local Joint Apprenticeship Committee*, 685 F.Supp. 718 (N.D.Cal.1988), *aff'd*, 891 F.2d 719 (9th Cir.1989), *cert. denied*, 498 U.S. 822, 111 S.Ct. 72, 112 L.Ed.2d 46 (1990) (the Ninth Circuit did not reach the NLRA preemption question because it affirmed on other grounds). In *Hydrostorage*, the District Court ruled that a state order requiring an employer to enter into a collective bargaining agreement to train apprentices was preempted by the NLRA. The District Court relied upon *Golden State* in holding that the State could not penalize an employer for not becoming a party to a collective bargaining agreement that it did not voluntarily negotiate. *Hydrostorage*, 685 F.Supp., at 725. The State was "intruding into the area of collective bargaining from which Congress under the NLRA excluded it ... 'The NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach an agreement.'" *Id.*, citing *Golden State*, at 616, 106 S.Ct. at 1399–1400. The law at issue in the instant case provides a contrast to the order in *Hydrostorage*, for MinnesotaCare does not penalize anyone for refusing to agree to specific contract terms.

Appellant has not stated any valid basis upon which the NLRA could preempt a state law that imposes a 2 percent tax that will ultimately be passed along to some degree to an ERISA plan. In *Metropolitan, supra*, the Supreme Court upheld against both ERISA and NLRA preemption challenges a Massachusetts statute that required certain minimum mental health care benefits be provided a person under general insurance policies; the statute was designed in part to insure that people who were not wealthy could obtain adequate mental health care treatment should they require it. 471 U.S., at 758, 105 S.Ct., at 2399. Justice Blackmun acknowledged in *Metropolitan* that the state statute forced the parties to the collective bargaining agreement to make a choice: "either they must purchase the mandated benefit, decide not to provide health coverage at all, or decide to become self-insured, assuming they are in a financial position to make that choice." *Id.*, at 748, 105 S.Ct., at 2393. The mandated benefit law was not preempted by NLRA, despite the fact that it may affect substantive benefits available for collective bargaining.

The provider tax does not present the state interference and compulsion present in *Golden State* and *Hydrostorage*. The District Court's analysis of *United Mine Workers* was correct. There is no preemption under labor law.

## CONCLUSION

The District Court was correct in holding that appellants did not have standing to challenge the data reporting and spending cap provisions of the statute. The MinnesotaCare provider tax is not preempted by ERISA or the LMRA. The District Court is affirmed.